# IN THE SUPREME COURT OF CALIFORNIA

JOHN'S GRILL, INC., et al.,
Plaintiffs and Appellants,

v.

THE HARTFORD FINANCIAL SERVICES
GROUP, INC., et al.,
Defendants and Respondents.

S278481

First Appellate District, Division Four
A162709

San Francisco City and County Superior Court
CGC-20-584184

---

August 8, 2024

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

---

JOHN'S GRILL, INC. v.
THE HARTFORD FINANCIAL SERVICES GROUP, INC.

S278481

Opinion of the Court by Guerrero, C. J.

Plaintiffs John's Grill, Inc., and John Konstin (together, John's Grill) operate a restaurant in San Francisco. Like many businesses, John's Grill suffered substantial financial losses during the COVID-19 pandemic. John's Grill sought compensation for its losses from its property insurer, Sentinel Insurance Company, Ltd. (Sentinel). Sentinel denied coverage on various grounds, including that the loss or damage claimed by John's Grill did not fall within the insurance policy's "Limited Fungi, Bacteria or Virus Coverage" endorsement. The Limited Fungi, Bacteria or Virus Coverage endorsement generally *excludes* coverage for any virus-related loss or damage that the policy would otherwise provide, but it *extends* coverage for virus-related loss or damage if the virus was the result of certain specified causes of loss, including windstorms, water damage, vandalism, and explosion.

The validity of this specified cause of loss limitation is the focus of the parties' dispute. John's Grill acknowledges it cannot meet this limitation, but it contends the limitation is unenforceable because it renders the policy's promise of virus-related coverage illusory. The Court of Appeal below agreed with John's Grill. It held that the promise of coverage was illusory because John's Grill had no realistic prospect of benefitting from the virus-related coverage as written. (*John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2022)

1

86 Cal.App.5th 1195, 1224 (*John's Grill*).) It therefore invalidated the specified cause of loss limitation and allowed John's Grill's claims for virus-related losses or damage to proceed. (*Id.* at p. 1212.)

We conclude the Court of Appeal erred by declining to enforce the specified cause of loss limitation under the circumstances here. The terms of the Limited Fungi, Bacteria or Virus Coverage endorsement are clear and unambiguous. It provides virus-related coverage, but only if the virus results from certain specified causes of loss. In accordance with long-settled principles of contract interpretation, the plain meaning of the policy governs. Because John's Grill admits that it cannot satisfy the specified cause of loss limitation, it has no claim for coverage under the policy.

John's Grill cannot escape this conclusion by citing the so-called illusory coverage doctrine. This court has never recognized an illusory coverage doctrine as such. The doctrine as articulated by John's Grill does not appear in our precedents. But even assuming some version of the doctrine may exist under California law, we conclude that an insured must make a foundational showing that it had a reasonable expectation that the policy would cover the insured's claimed loss or damage. Such a reasonable expectation of coverage is necessary under any assumed version of the doctrine. Here, however, John's Grill has not shown it had a reasonable expectation of coverage under the policy for its pandemic-related losses. It has therefore failed to establish that the policy created the illusion of coverage that rendered any contrary policy language unenforceable. Moreover, even setting aside this hurdle, and accepting John's Grill's articulation of the doctrine, it still cannot demonstrate

that the policy's promised coverage was illusory. Even with the specified cause of loss limitation, the policy offered John's Grill a realistic prospect for virus-related coverage. Because the Court of Appeal held otherwise, we reverse and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the trial court, Sentinel successfully demurred to John's Grill's operative complaint for damages and other relief. "Accordingly, we assume that the complaint's properly pleaded material allegations are true and give the complaint a reasonable interpretation by reading it as a whole and all its parts in their context." (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

According to its operative complaint, John's Grill is "a historic, family-owned, landmark restaurant located in the heart of downtown San Francisco." Its business was heavily impacted by the COVID-19 pandemic and related state and local public health orders. For example, between March 2020 and September 2020, indoor dining — "the lifeblood of John's Grill's business" — was prohibited. After September 2020, indoor dining was limited to 25 percent of restaurant capacity. As a result of these restrictions, "John's Grill suffered substantial financial losses and had to let 54 workers go."

Moreover, even absent these restrictions, John's Grill alleges it "would have had to close and suspend its operations due to the worsening pandemic-level presence of the

3

Coronavirus in, on, and around the Insured Premises." The COVID-19 virus is a deadly infectious disease that can be transmitted from person to person through small respiratory droplets, which spread when an infected person coughs or exhales. The droplets can also "land on objects and surfaces around the person" and may infect others who come into contact with the object or surface. John's Grill further alleges, "When physical droplets containing COVID-19 land on or otherwise attach to surfaces, [the virus] renders those surfaces and the immediate surrounding area unusable because there is substantial risk of people getting sick, transmitting infection to others, and possibly dying as a result of touching those surfaces." Given the presence of the COVID-19 virus in the community, "John's Grill could not have reopened during this ongoing closure period due to the high statistical likelihood, if not certainty, that the Insured Premises would have been regularly re-damaged by the recurrent reintroduction of infectious Coronavirus into the Insured Premises from COVID-19 infected individuals and personal property."

John's Grill had purchased a first-party commercial property insurance policy from Sentinel. Under the policy, Sentinel generally agreed to pay for "direct physical loss of or physical damage to" covered property. The covered property included both the physical premises of John's Grill and personal property associated with its restaurant business. In the event the direct physical loss or damage to property caused a suspension of business operations, Sentinel agreed to pay for "the actual loss of Business Income" suffered by John's Grill "during the 'period of restoration,' " as well as any "reasonable and necessary Extra Expense" incurred "during the 'period of

restoration' that [John's Grill] would not have incurred if there had been no direct physical loss or physical damage to property." "Extra Expense" includes expenses incurred to "avoid or minimize the suspension of business and to continue 'operations'" and to "repair or replace any property." The "period of restoration" begins on the date of direct physical loss or damage and ends when the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality" or when the "business is resumed at a new, permanent location."

As noted, the policy included a Limited Fungi, Bacteria or Virus Coverage endorsement. The endorsement added a broad exclusion for loss or damage caused by viruses and other microorganisms: "We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss: [¶] (1) Presence, growth, proliferation, spread or any activity of 'fungi,' wet rot, dry rot, bacteria or virus."[1] However, the exclusion did not apply if the "'fungi,' wet or dry rot, bacteria or virus results from fire or lightning" or to the extent the endorsement provided specific additional coverage.

The specific additional coverage provided by the endorsement applied only "when the 'fungi,' wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period . . . . [¶] (1) A 'specified cause of loss' other than fire or lightning; [¶]

---

[1] The policy defined "fungi" as "any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi."

(2) Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises." Elsewhere in the policy, "specified cause of loss" was defined as "[f]ire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; [and] water damage."

Under this specific additional coverage, Sentinel agreed to pay "for loss or damage by 'fungi,' wet rot, dry rot, bacteria and virus." In this context, "loss or damage" was defined as follows: "(1) Direct physical loss or direct physical damage to Covered Property caused by 'fungi,' wet rot, dry rot, bacteria or virus, including the cost of removal of the 'fungi,' wet rot, dry rot, bacteria or virus; [¶] (2) The cost to tear out and replace any part of the building or other property as needed to gain access to the 'fungi,' wet rot, dry rot, bacteria or virus; and [¶] (3) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that 'fungi,' wet rot, dry rot, bacteria or virus are present." The policy limit for this additional coverage was $50,000 with 30 days of business interruption.

John's Grill sought coverage under the policy for its pandemic-related losses, i.e., "lost Business Income due to the Closure Orders and the damage caused by the presence of Coronavirus in and around the Insured Premises." Sentinel denied the claim by letter. The letter stated, "We have completed a review of your loss and have determined that since the coronavirus did not cause property damage at your place of business or in the immediate area, this business income loss is

6

not covered. Even if the virus did cause damage, it is excluded from the policy, and the limited coverage available for losses caused by virus does not apply to the facts of your loss." Among other grounds for denial, the letter cited the policy's requirement of direct physical loss or damage to property. It explained, "This property policy protects your business personal property and/or building against risks of direct physical loss or damage at your Scheduled Premises. You have not identified any direct physical loss to any property at a scheduled premises." Similarly, the letter maintained, "The Business Income coverage is not provided for your claim because there has been no physical loss or damage caused by or resulting from a Covered Cause of Loss to property at a scheduled premises." Regarding the Limited Fungi, Bacteria or Virus Coverage endorsement, the letter stated, "As we understand your loss, the virus did not result from a specified cause of loss; therefore, there is no coverage for your claim based on the limited coverage for virus."

A short time later, John's Grill filed this lawsuit.[2] Its operative complaint included causes of action for breach of contract, bad faith denial of an insurance claim, and unfair business practices, among others. In addition to the historical facts described above, the complaint alleged several theories

---

[2] In the underlying lawsuit, John's Grill sued both Sentinel and The Hartford Financial Services Group, Inc. (Hartford). Hartford successfully moved to quash service based on lack of personal jurisdiction, and the Court of Appeal affirmed as to Hartford. (*John's Grill, supra,* 86 Cal.App.5th at p. 1201.) John's Grill has not challenged that portion of the Court of Appeal's opinion, so we need not consider it.

under which John's Grill would be entitled to insurance coverage for its pandemic-related losses. As relevant here, John's Grill maintained that the specified cause of loss limitation in the Limited Fungi, Bacteria or Virus Coverage endorsement rendered any promise of coverage illusory, thus requiring Sentinel to cover pandemic-related losses regardless of cause. John's Grill argued that the specified cause of loss limitation was "absurd" because the specified causes "are not the kinds of things that cause a virus." The specified cause of loss limitation was therefore "impossible to satisfy," its inclusion in the policy "outrageous," and its application contrary to John's Grill's "reasonable expectations" regarding the Limited Fungi, Bacteria or Virus Coverage endorsement.

In its cause of action for unfair business practices, John's Grill further addressed the Limited Fungi, Bacteria or Virus Coverage endorsement. It alleged that the specified cause of loss limitation could not be satisfied because the specified losses were "incapable of either (1) acting as the causative agent of genetic substitution, insertion, deletion, recombination, reassortment, or other means of genetic mutation that cause viruses, or (2) otherwise creating conditions that can fairly be said to be a proximate cause of a virus." Moreover, John's Grill alleged that "no reasonable insured would expect that any virus that causes them loss would be capable of satisfying the absurd coverage requirement, nor would a reasonable insured expect an insurance policy to contain such a coverage requirement."

Sentinel demurred to the complaint on the ground that John's Grill had not alleged facts sufficient to state any cause of action. Among other things, Sentinel argued that virus coverage under the Limited Fungi, Bacteria or Virus Coverage

8

endorsement was not illusory. As an example, Sentinel cited an opinion of the Nebraska Supreme Court discussing transmission of pseudorabies virus by windstorm. (See *Curtis O. Griess & Sons, Inc. v. Farm Bureau Ins. Co.* (Neb. 1995) 528 N.W.2d 329, 331 (*Griess*).) Sentinel also maintained that coverage was not illusory because "there are circumstances where virus, bacteria, mold or rot coverage could be provided."

The trial court sustained Sentinel's demurrer. It reasoned that Sentinel's policy would be illusory if "there were no possibility of coverage," but John's Grill had not made such a showing. The court stated, "It is not a stretch of the imagination to conclude that some of the listed specified causes of loss (e.g., water damage or windstorm) could cause fungi damage. In addition, it is possible that a windstorm could cause a virus [citing *Griess*]." The court found that the language of the policy was "clear and unambiguous" and therefore enforceable against John's Grill.

On appeal, John's Grill again contended the coverage offered by the Limited Fungi, Bacteria or Virus Coverage endorsement was illusory. The Court of Appeal agreed. (*John's Grill*, *supra*, 86 Cal.App.5th at p. 1220.) It first appeared to hold that the language of the endorsement was ambiguous: "Literally read, [the specified cause of loss limitation] is indecipherable when applied to viruses. The critical limiting phrase is that, for the Limited Virus Coverage to apply, the virus must be the 'result of' one of a number of enumerated causes. But none of the listed causes has anything to do with the biological processes that actually cause a virus. . . . Only if the words are taken to refer to circumstances in which a specified cause is a *vector for transmission of a virus* does the language

begin to make any sense in the context of this particular peril [water damage]. But that is not what the words say, and more importantly, it is not the only interpretation to which the phrase 'result of' is reasonably susceptible. Pathogenic causation — in the sense that, say, cancer may be said to be the 'result of' a toxic carcinogen — is another perfectly reasonable interpretation that could be adopted, and it tends to favor John's Grill's contention that the Specified Causes Clause is impossible to meet." (*Id.* at p. 1221, fn. omitted.)

Next, the Court of Appeal held that, even under Sentinel's interpretation of the Limited Fungi, Bacteria or Virus Coverage endorsement as including transmission, the endorsement did not offer a realistic prospect for virus-related coverage. The court accepted that the endorsement might provide coverage for loss or damage to " 'living property' " (i.e., animals and possibly plants) that were infected by a virus transmitted through a specified cause of loss identified in the policy, as in the *Griess* example. (*John's Grill*, *supra*, 86 Cal.App.5th at p. 1223; see *id.* at pp. 1223–1224.) But because John's Grill apparently did not own any living property, the Court of Appeal believed the endorsement was nonetheless illusory in the context of this case. The court stated, "[I]n the end, all *Griess* shows is that it is possible to conjure up many scenarios that might notionally pose a risk of damage to some form of 'living property' for some businesses. But on this record, none of these abstract risks bear on the insurance policy Sentinel underwrote for *this* insured." (*Id.* at p. 1224.) It concluded, "Because Sentinel has not proffered enough to demonstrate a realistic prospect of John's Grill ever benefitting from the Limited Virus Coverage based on events the parties might reasonably have anticipated during the

Policy period, we agree that Sentinel has, 'through sweeping language,' rendered the Policy's virus coverage terms 'virtually illusory.' " (*Ibid.*) The court therefore reversed the judgment as to Sentinel and remanded for further proceedings. (*Id.* at p. 1228.) We granted Sentinel's petition for review.[3]

## II. DISCUSSION

### A. Standards of Review and Policy Interpretation

"On review of the judgment of the Court of Appeal reversing the superior court's order[] sustaining defendant['s] demurrer[], we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory . . . ." (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) "[I]t is well settled that a general demurrer admits the truth of all material factual allegations in the complaint [citation]; that the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court [citations]; and that plaintiff need only plead facts showing that he may be entitled to some relief [citation]." (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496.)

---

[3] The Court of Appeal noted that, during the pendency of the appeal, the parties had reached a settlement and stipulated to dismissal. (*John's Grill, supra*, 86 Cal.App.5th at p. 1205; see Cal. Rules of Court, rule 8.244.) The Court of Appeal declined to dismiss the appeal because it raised "issues 'of continuing public interest which are likely to recur.' " (*John's Grill*, at p. 1205, quoting *Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 445, fn. 2.) We granted review notwithstanding this settlement, and we likewise consider the issues in this matter on their merits, even though they are technically moot.

"Insurance policies are contracts and, therefore, are governed in the first instance by the rules of construction applicable to contracts." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666.) " 'Thus, "the mutual intention of the parties at the time the contract is formed governs interpretation." [Citation.] If possible, we infer this intent solely from the written provisions of the insurance policy. [Citation.] If the policy language "is clear and explicit, it governs." ' " (*Yahoo Inc. v. National Union Fire Ins. Co.* (2022) 14 Cal.5th 58, 67 (*Yahoo*).) "When interpreting a policy provision, we must give its terms their ' "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' [Citation.] We must also interpret these terms 'in context' [citation], and give effect 'to every part' of the policy with 'each clause helping to interpret the other.' " (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 (*Palmer*).)

"A policy provision is ambiguous *only* if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole." (*Palmer*, *supra*, 21 Cal.4th at p. 1115.) " 'The mere fact that a word or phrase in a policy may have multiple meanings does not create an ambiguity.' [Citation.] Rather, the meaning of the word or phrase must be considered in light of its context." (*Yahoo*, *supra*, 14 Cal.5th at p. 69.) " 'If the terms are ambiguous . . . , we interpret them to protect " 'the objectively reasonable expectations of the insured.' " [Citations.] Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer.' " (*Id.* at p. 67.)

### B. "Specified Cause of Loss" Limitation

It appears undisputed that, read literally, the Limited Fungi, Bacteria or Virus Coverage endorsement provides coverage only when "the 'fungi,' wet or dry rot, bacteria or virus" results from certain causes, including "[a] 'specified cause of loss' other than fire or lightning." As noted, "specified cause of loss" is defined in the policy as "[f]ire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." These specified causes mirror, with two omissions, the traditional named perils identified in insurance industry forms for commercial property insurance coverage. (See 5 New Appleman on Insurance Law Library Edition (2023) § 41.02[1][a].)

To the extent this language is " ' "clear and explicit, it governs." ' " (*Yahoo, supra*, 14 Cal.5th at p. 67.) The Court of Appeal held that this language was not clear, but rather it was "indecipherable when applied to viruses." (*John's Grill, supra*, 86 Cal.App.5th at p. 1221.) John's Grill similarly argues that a literal reading "makes no sense." Both conclusions rely on the premise that viruses cannot replicate outside of a host organism, and thus they cannot "result[] from" an inanimate force or phenomenon. But replication is not the only way that a force or phenomenon may bring about a virus. A force or phenomenon may also *transmit* a virus. Indeed, the Court of Appeal acknowledged as much. (*Id.* at pp. 1221–1222.)

Thus, in ordinary usage, a person might say that a viral infection resulted from contaminated drinking water or contact with a contaminated object. The contaminated water or object

did not cause the virus to replicate, but it nonetheless brought the virus to a new environment where it could do so. From that perspective, the virus "result[ed] from" the contaminated water or object because the contaminated water or object transmitted it to the new environment. Given this ordinary usage, it is reasonable to construe the policy language as including transmission. Under this construction, the policy language is not indecipherable or otherwise unclear when applied to viruses.

The Court of Appeal appeared to believe that this possible construction rendered the specified cause of loss limitation at best ambiguous. (*John's Grill*, *supra*, 86 Cal.App.5th at pp. 1221–1222.) But the alternative interpretation proposed by the Court of Appeal rendered the policy language "indecipherable" in its view. (*Id*. at p. 1221.) This situation does not lead to an ambiguity. Policy language is ambiguous "only if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole." (*Palmer*, *supra*, 21 Cal.4th at p. 1115, italics omitted.) " 'The mere fact that a word or phrase in a policy may have multiple meanings does not create an ambiguity.' [Citation.] Rather, the meaning of the word or phrase must be considered in light of its context." (*Yahoo*, *supra*, 14 Cal.5th at p. 69.) An interpretation that is nonsensical, or which renders the policy language indecipherable, is not a *reasonable* construction and cannot create an ambiguity. Contrary to the Court of Appeal's position, courts are required to interpret policy language in a reasonable manner so that it "makes sense as applied." (*John's Grill*, at p. 1222.)

John's Grill next argues that the plain language of the policy should not be enforced under the so-called illusory

coverage doctrine. It contends that the specified cause of loss limitation makes it impossible, or virtually impossible, for it to recover for virus-related loss or damage. Thus, in its view, the limitation should be disregarded, and any virus-related loss or damage should be covered under the policy *regardless of cause*. For reasons we explain, we disagree that the specified cause of loss limitation is unenforceable under the circumstances here.

This court has never recognized an illusory coverage doctrine as such. The Court of Appeal below cited the well-established principle that " ' "[w]ords of promise which by their terms make performance entirely optional with the 'promisor' . . . do not constitute a promise." ' " (*John's Grill*, *supra*, 86 Cal.App.5th at pp. 1220–1221; see Rest.2d Contracts, § 2, com. e.) But the performance sought by John's Grill is not optional; it is expressly excluded by the terms of the policy. Moreover, although the type of optional promise cited by the Court of Appeal is sometimes described as an "illusory" promise (*Steiner v. Thexton* (2010) 48 Cal.4th 411, 423), that idea is distinct from a claim that a binding promise of insurance coverage is illusory. The principle of contract formation cited by the Court of Appeal does not imply the existence of an illusory coverage doctrine in general or in any particular form. The consequences of an optional or discretionary promise are well-established and do not generally involve invalidating express terms or limitations on performance. (See *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 923 [if a contract is formed, discretion may be limited by the implied covenant of good faith and fair dealing]; see also *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 ["as a general matter, implied terms should never be read

to vary express terms"].)  Amicus curiae United Policyholders claims that "[n]early 70 years ago, this Court held that a contract provision that effectively renders the express promises made in the contract illusory is unenforceable."  But the authority cited by United Policyholders did not consider a contract provision that rendered an express promise illusory.  To the contrary, we considered whether a sales contract that failed to fix the purchase price was unenforceable because it was "so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained."  (*California Lettuce Growers, Inc. v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481.)  Our consideration of that situation provides little guidance regarding the enforceability of the clear terms of the specified cause of loss limitation under the circumstances here.[4]

More relevant is our express endorsement of the proposition that " '[a]n insurance company can limit the coverage of a policy issued by it as long as such limitation conforms to the law and is not contrary to public policy.' [Citation.]  'An insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances.' [Citation.]  It follows that an insurer is not absolutely prohibited from drafting and enforcing policy provisions that provide or leave intact coverage for some, but not all, manifestations of a particular peril.  This is, in fact, an everyday practice . . . ."

---

[4]  John's Grill does not contend the policy itself is unenforceable based on lack of consideration.  Nor does John's Grill assert any traditional contract defenses such as fraud, mistake, illegality, or unconscionability.

(*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 759 (*Julian*).)

"For example, a policy might exclude losses caused by freezing to plumbing, but provide coverage for other types of freezing, or vice versa. The fact that the exclusion does not apply to all types of freezing does not, by itself, render it invalid. Likewise, an insurance policy can provide coverage for weather conditions generally, but exclude coverage for specific weather conditions such as hail, wind, or rain. The fact that hail, wind, and rain are types of weather conditions does not bind the insurer to insure against all weather conditions, or none at all. A reasonable insured would readily understand from the policy language which perils are covered and which are not." (*Julian*, *supra*, 35 Cal.4th at p. 759.)

We have recognized only limited situations where the plain language of an insurance policy will not be enforced. For example, "to be enforceable, any provision that takes away or limits coverage reasonably expected by an insured must be 'conspicuous, plain and clear.'" (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 (*Haynes*).) John's Grill does not contend the specified cause of loss limitation runs afoul of this principle. Indeed, the coverage provisions of the Limited Fungi, Bacteria or Virus Coverage endorsement begin with a clear statement of the specified cause of loss limitation: "The coverage described in 1.b. below only applies when the 'fungi,' wet or dry rot, bacteria or virus is the result of one or more of the following causes . . . . [¶] (1) A 'specified cause of loss' other than fire or lightning." John's Grill complains about the length of the policy and the fact that the phrase "specified cause of loss" is not defined in the Limited Fungi, Bacteria or Virus Coverage

endorsement itself, but it does not contend these circumstances alone render the specified cause of loss limitation unenforceable.

As another example, we have held that "[p]olicy exclusions are unenforceable to the extent that they conflict with [Insurance Code] section 530[5] and the efficient proximate cause doctrine." (*Julian*, *supra*, 35 Cal.4th at p. 754.) This doctrine ensures that insurance coverage is available where a covered cause of loss "is the predominant, or most important cause of a loss." (*Ibid*.) "By focusing the causal inquiry on the most important cause of a loss, the efficient proximate cause doctrine creates a 'workable rule of coverage that provides a fair result within the reasonable expectations of both the insured and the insurer.'" (*Ibid*.) In this context, we have "rejected insurers' attempts to contract around the proximate cause doctrine through sweeping language that would have rendered the policies' coverage terms virtually illusory." (*Id*. at p. 756.) But we have enforced limitations on coverage that do not violate the efficient proximate cause doctrine where "a reasonable insured would readily grasp the difference" between covered and excluded losses, thus "undermining the threat of illusory insurance." (*Id*. at p. 760.) John's Grill does not contend that the efficient proximate cause doctrine or Insurance Code section 530 has any relevance here.

---

[5] The cited statute provides, "An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril not contemplated by the contract may have been a remote cause of the loss; but he is not liable for a loss of which the peril insured against was only a remote cause." (Ins. Code, § 530.)

This court confronted the prospect of illusory coverage more directly in *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758 (*Safeco*). *Safeco* involved a homeowners insurance policy in which the insurance company "agreed to defend and indemnify the insureds in the event of claims brought against any insured for bodily injury caused by 'an occurrence,' which the policy defined as an accident resulting in bodily injury during the policy period." (*Id*. at p. 762.) The policy contained an exclusion for "bodily injury 'arising out of any *illegal act* committed by or at the direction of an insured.'" (*Ibid*.)

In *Safeco*, the homeowners were sued after their teenaged son accidentally shot and killed a friend while playing with a gun he believed to be unloaded. (*Safeco*, *supra*, 26 Cal.4th at p. 761.) A juvenile court found that the son had committed involuntary manslaughter (Pen. Code, § 192, subd. (b)) and placed him on probation. (*Safeco*, at p. 761.) After the homeowners tendered defense of the lawsuit to their insurance company, the company sought declaratory relief that coverage was unavailable under an "'illegal act'" exclusion in the policy. (*Ibid*.)

We held, as an initial matter, that the phrase "'illegal act'" was ambiguous because it was "susceptible of two reasonable meanings." (*Safeco*, *supra*, 26 Cal.4th at p. 763.) It could be construed broadly to mean "any act prohibited by law. But the term can also be interpreted more narrowly as meaning a violation of criminal law." (*Ibid*.) We determined that it would be inappropriate to read the phrase narrowly, and if it were read broadly it would be "so broad as to render the policy's liability coverage practically meaningless." (*Id*. at p. 764.) "[A] violation of 'any law' would include the law governing negligence, which

holds individuals responsible for the failure to exercise ordinary care resulting in injury to another." (*Ibid*., citing Civ. Code, § 1714.) But the insurance policy promised coverage for negligence (through its use of the term "accident"), and "[t]hat promise would be rendered illusory if . . . we were to construe the phrase 'illegal act,' as contained in the policy's exclusionary clause, to mean violation of any law, whether criminal or civil." (*Safeco*, at p. 765.) In the end, we concluded that "the illegal act exclusion cannot reasonably be given meaning under established rules of construction of a contract" and "must be rejected as invalid." (*Id*. at p. 766.) For the last proposition, we relied on Civil Code section 1653, which provides, "Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected."

Our discussion of illusory coverage in *Safeco* was therefore expressly predicated on the insoluble ambiguity of the phrase "illegal act" in light of the overall policy, including its promised coverage for "accident[s]." (*Safeco, supra*, 26 Cal.4th at p. 765.) We had no occasion to consider whether unambiguous policy language might be invalidated under a theory of illusory coverage. *Safeco* does not support John's Grill's contention that the specified cause of loss limitation is unenforceable.

John's Grill relies on *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847 (*Shade Foods*) to support its contention that the specified cause of loss limitation should be disregarded. But that case, like *Safeco*, involved a potentially ambiguous policy term whose interpretation was aided, in part, by the prospect of illusory coverage. The insured in *Shade Foods* was a processor and supplier of almonds for use in breakfast cereal. (*Id*. at p. 861.)

It was covered by an insurance policy "that provided general liability coverage with a $1 million limit per occurrence and property coverage for 'stock' with a $3 million limit." (*Id.* at pp. 861–862; see *id.* at p. 872 [policy declarations "listed 'stock' as having 'special' coverage within a limit of $3 million of insurance"].)

After a customer found that a batch of almonds was contaminated with wood splinters, a dispute arose over whether this loss was included in the insured's " 'stock' " coverage. (*Shade Foods, supra,* 78 Cal.App.4th at p. 862.) The appellate court determined that the policy could reasonably be construed to cover the loss. (*Id.* at pp. 873–874.) It explained, "consistent with the narrow interpretation of exclusionary clauses, the qualifying language may reasonably be construed as applying to the present case, thereby causing the exclusion to be inapplicable." (*Id.* at p. 874.) Among the reasons to adopt such a construction, the court observed, "The insurance coverage for 'stock' would be meaningless if it did not apply to the almonds, owned by others, that were processed at [the insured's] plant." (*Ibid.*) Moreover, "the coverage for physical damage on [these] premises would be illusory if it were forfeited by transporting the products to another location." (*Ibid.*) Thus, while *Shade Foods* supports the proposition that courts should avoid reading ambiguous policy language in a manner that would render coverage illusory, it does not support the contention by John's Grill that the specified cause of loss limitation should be disregarded.

John's Grill relies on a respected practice guide for the proposition that "[e]ven plain language may not be enforced if doing so would render the promised coverage illusory." (Croskey

et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2023) ¶ 4:29.) But the guide goes on to explain, "Instead, the language will be construed in a manner that the insured reasonably would expect." (*Ibid*.) To the extent our precedents have discussed the concept of illusory coverage, we have likewise emphasized an insured's reasonable expectations. (See *Julian*, *supra*, 35 Cal.4th at p. 761 [the efficient proximate cause doctrine "brings about 'a fair result within the reasonable expectations of both the insured and the insurer' "]; *Safeco*, *supra*, 26 Cal.4th at p. 766 [proper inquiry focuses on the expectations of "reasonable insureds"]; see also *Haynes*, *supra*, 32 Cal.4th at p. 1204 ["coverage reasonably expected by an insured"]; *Shade Foods*, *supra*, 78 Cal.App.4th at p. 874 [chosen construction "unquestionably squares with the objectively reasonable expectations of the insured"].) The Court of Appeal below agreed that "the test for illusory coverage must focus on objective reality and the insured's reasonable expectations of coverage." (*John's Grill*, *supra*, 86 Cal.App.5th at p. 1224.)

Thus, even if we were to consider this line of thinking, John's Grill would have to show it had a reasonable expectation of coverage for its pandemic-related losses. It has not. A reasonable insured would understand that virus coverage under the Limited Fungi, Bacteria or Virus Coverage endorsement was *limited* and would be available only if the virus resulted from certain causes. (See *Julian*, *supra*, 35 Cal.4th at p. 760 [reasonable insured would "readily grasp the difference" between separate chains of causation].) Based on the policy language, John's Grill could not have an objectively reasonable expectation when it obtained the policy that it would provide coverage for *all* virus-related loss or damage, regardless of

cause. (See *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 408 [an insured cannot reasonably expect coverage where the cause of the loss is "expressly *excluded* under the policy"].) John's Grill argues that it had a reasonable expectation there would be "a reasonable number of factual scenarios in which it would have limited coverage for loss caused by virus." But the clear and unambiguous policy language defined the factual scenarios in which John's Grill would have coverage. To the extent John's Grill contends it reasonably expected additional coverage based on other circumstances, such an expectation is contradicted by the policy language, and it is wholly unsupported and undefined. John's Grill has not shown it had a reasonable expectation in virus-related coverage beyond the policy's terms.[6]

The absence of any reasonable expectation of coverage would appear sufficient to foreclose John's Grill's claim for coverage here. But even setting aside that hurdle, and accepting John's Grill's articulation of the illusory coverage doctrine, it cannot prevail. John's Grill contends the specified cause of loss

---

[6] John's Grill also argues its reasonable expectations might be relevant where the terms of the policy "are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print purports to take away what is written in large print." (*Hallowell v. State Farm Mutual Auto Ins. Co.* (Del. 1982) 443 A.2d 925, 928.) We have already explained why the policy terms here are neither ambiguous nor conflicting. Nor has John's Grill shown the policy contains a hidden trap or pitfall, or that the specified cause of loss exclusion was unreasonably buried in fine print. We therefore have no occasion to consider how or whether the circumstances identified in *Hallowell* might affect our interpretation of an insurance policy.

limitation renders the policy's virus-related coverage illusory, and it is therefore unenforceable, unless there is some reasonably expected set of circumstances in which virus-related coverage is available.[7]  In this context, it is important to note that John's Grill bears the burden of alleging facts sufficient to support the application of the doctrine.  The policy itself does not support John's Grill's claim for coverage.  Only through the application of the illusory coverage doctrine does John's Grill arguably have coverage.  The application of the doctrine is essential to its claims, and therefore John's Grill must support its application here with sufficient factual allegations in its complaint.  (See *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 437, fn. 4 ["The absence of any allegation essential to a cause of action renders it vulnerable to a general demurrer"].)

John's Grill relies principally on its assertion that the specified cause of loss limitation is illogical or indecipherable when applied to viruses.  We have already explained why this assertion is unpersuasive.  John's Grill also offers the purely conclusory assertion that the forces and phenomena identified in the specified cause of loss limitation are "incapable" of "creating conditions that can fairly be said to be a proximate cause of a virus."  But John's Grill never addresses, for example, why a virus at its premises could not result from phenomena

---

[7]    John's Grill emphasizes the idea of fairness in this context, but there is already an established body of law addressing the circumstances in which a contract (or contractual provision) might be rendered unenforceable based on unfair or overly harsh terms:  the doctrine of unconscionability. (See, e.g., *OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125.)  John's Grill has not attempted to show this doctrine applies here.

such as a windstorm or water damage that carried it there, or even an explosion, vandalism, or riot or civil commotion that releases it. Case law demonstrates that such scenarios are not implausible. (See, e.g., *Griess, supra,* 528 N.W.2d at p. 331 ["Appellee plaintiff's swine were infected with pseudorabies after a tornado carried the virus to its swine-raising operation"].) Indeed, our criminal law contemplates that biological agents such as viruses can be dispersed by "explosive, thermal, pneumatic, or mechanical means." (Pen. Code, § 11417, subd. (a)(6).) John's Grill itself alleges that "[d]roplets containing Coronavirus can . . . travel and remain infectious while suspended in the air" and the virus "can remain infectious on a variety of surfaces and objects from a few hours to several days." The potential for virus transmission or dispersal by inanimate force or phenomenon is apparent from these allegations.

The Court of Appeal below did not believe the *Griess* example was relevant because "John's Grill is not a farm, and even assuming pets may be found on its premises from time to time, coverage is afforded for animals under the Policy only if '[t]hey are owned by others and boarded by you, or owned by you and held for sale or sold but not delivered.' If John's Grill were operating a dog kennel or a pet store, perhaps the *Griess* case might have some relevance, but not on the actual business circumstances we are dealing with here." (*John's Grill, supra,* 86 Cal.App.5th at pp. 1223–1224.) But restaurants may hold living animals for sale, such as lobster or fish. In addition, a restaurant certainly handles both raw and cooked food. Sentinel agrees if food were contaminated by a virus, it "could be covered as lost stock or business property when they need to be

destroyed." John's Grill has not shown that the prospect of such contamination by water damage or other specified cause of loss is so unrealistic as to render the promised coverage illusory. John's Grill could assess for itself whether it, specifically, was likely to benefit from the coverage based on the policy's terms. The fact that John's Grill's particular business arrangements would make it unlikely to benefit from the policy's limited virus coverage would be something for John's Grill to consider when obtaining coverage. But even John's Grill's own conception of the illusory coverage doctrine is insufficient to justify disregarding the plain language of the policy. The Court of Appeal erred by holding otherwise.[8]

In sum, under the circumstances here, John's Grill cannot invoke the illusory coverage doctrine to transform the policy's *limited* virus-related coverage into *unlimited* virus-related coverage. The policy's limitations on coverage were explicit and unambiguous. Absent some extraordinary circumstance, courts must enforce such explicit and unambiguous policy limitations. John's Grill has not shown any such extraordinary circumstances exist here.[9]

---

[8] In *Brooklyn Restaurants, Inc. v. Sentinel Ins. Co., Ltd.* (2024) 100 Cal.App.5th 1036, 1052–1054, review granted June 12, 2024, S284887, another Court of Appeal followed *John's Grill* and held that this specified cause of loss limitation was illusory and unenforceable. We disapprove *Brooklyn Restaurants, Inc. v. Sentinel Ins. Co., Ltd.*, *supra*, 100 Cal.App.5th 1036, review granted, to the extent it is inconsistent with this opinion.

[9] Sentinel additionally argues that the Court of Appeal erred by holding that John's Grill had adequately alleged "loss

## III. DISPOSITION

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with this opinion.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

---

or damage" under the Limited Fungi, Bacteria or Virus Coverage endorsement and the overall policy. (See *John's Grill, supra*, 86 Cal.App.5th at pp. 1214–1217.) In light of our conclusion that John's Grill cannot avoid the specified cause of loss limitation, we need not consider this argument. (See Cal. Rules of Court, rule 8.516(b)(3).) We therefore express no opinion regarding whether the Court of Appeal's holding on this issue (or the same holding in *Brooklyn Restaurants*) is consistent with our recent opinion in *Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (2024) 15 Cal.5th 1106, 1117, which considered the meaning of "direct physical loss or damage" to property in similar but not identical circumstances.

For its part, John's Grill additionally argues that, regardless of whether the specified cause of loss limitation can be enforced, it does not apply to the policy's time element coverage. (Cf. *Cosmetic Laser, Inc. v. Twin City Fire Insurance* (D.Conn. 2021) 554 F.Supp.3d 389, 402–403.) The Court of Appeal did not need to consider this argument, and it was not encompassed within our grant of review. We therefore decline to consider it in the first instance.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  John's Grill, Inc. v. The Hartford Financial Services Group, Inc.

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 86 Cal.App.5th 1195
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S278481
**Date Filed:** August 8, 2024

---

**Court:** Superior
**County:** San Francisco
**Judge:** Ethan P. Schulman

---

**Counsel:**

Cotchett, Pitre & McCarthy, Nanci E. Nishimura, Brian Danitz, Andrew F. Kirtley and Julia Q. Peng for Plaintiffs and Appellants.

Reed Smith, John N. Ellison, Richard P. Lewis, Jr., Katherine J. Ellena and Kathryn M. Bayes for French Laundry Partners, LP, KRM, Inc., and Yountville Food Emporium, LLC, as Amici Curiae on behalf of Plaintiffs and Appellants.

Covington & Burling, Richard Z. Lee, Barbara Tsao, Rani Gupta and David B. Goodwin for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Appellants.

Complex Appellate Litigation Group, Anna-Rose Mathieson, Melanie Gold; Steptoe & Johnson, Anthony J. Anscombe, Sarah D. Gordon; Wiggin and Dana, Jonathan Freiman, Tadhg Dooley, David R. Roth and Evan Bianchi for Defendants and Respondents.

Crowell & Moring and Mark D. Plevin for American Property Casualty Insurance Association as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew F. Kirtley
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000

Rani Gupta
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
(650) 632-4727

Anna-Rose Mathieson
Complex Appellate Litigation Group LLP
96 Jessie Street
San Francisco, CA 94105
(415) 649-6700